**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ERNEST N. FINLEY, JR., and** | ) | |
| **JENNIFER M. REAVES,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 2:23-00464-KKD-PBM** |
| | ) | |
| **THOMAS ALBRITTON, CYNTHIA** | ) | |
| **RAULSTON, and BYRON BUTLER,** | ) | |
| **in their individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This case stems from an ethics complaint that was filed with the Alabama Ethics
Commission (AEC) against Finley and Reaves. The AEC complaint alleged that Finley and
Reaves committed ethics violations when Finley allowed Reaves and Finley's son to have a third
attempt at handgun qualification. The AEC found cause to believe that Finley and Reaves had
committed minor ethics violations and recommended an administrative resolution. The Alabama
Attorney General rejected the recommendation and found that no ethics violation had been
committed by Finley or Reaves. All of the federal claims in this case are rooted in how the
ethics complaint was investigated and prosecuted by AEC employees. Finley and Reaves claim
that the AEC employees violated their constitutional rights to equal protection and due process.
Finley and Reaves also claim that the AEC conspired with the Mayor of Montgomery and the
City to violate their constitutional rights.

This action is before the Court on the motion for summary judgment filed by Defendants
Thomas Albritton, Cynthia Raulston, and Byron Butler and documents in support (docs. 99, 104,
126-129, 132 (Under Seal)) and the response filed by Plaintiffs Ernest N. Finley, Jr. and Jennifer

M. Reaves and documents in support (docs. 135-1, 144, 147 (Under Seal))[1].  For the reasons

stated herein, the motion is GRANTED as to all federal claims.   The Court declines to exercise

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims.

I.      Findings of fact[2]

        A.      The Parties

        1.      Plaintiff Ernest N. Finley, Jr. is a black male.  He was hired by the City of

Montgomery in 2015 as Chief of Police for the Montgomery Police Department (MPD).  At that

time, he had been a police officer for twenty-nine (29) years.  He served as Chief until June 8,

2021 when he resigned.

        2.      Plaintiff Jennifer M. Reaves is a white female.  She had been employed with the

MPD for twenty-six (26) years when Finley promoted Reaves to Deputy Chief of Operations in

July 2020.  Reaves reported to Finley.  She served in that position until August 12, 2021, when

she was reassigned to her former position as Jail Major, effective August 20, 2021.  After which,

Reaves took a week of leave, and then worked from August 12, 2021 to October 6, 2021, when

she took FMLA leave. She retired on August 30, 2022.

        3.      Defendant Thomas B. Albritton is a white male.  At all relevant times, he was the

Executive Director of the Alabama Ethics Commission (AEC) (doc. 126-1, Exhibit A, Albritton

---

[1] The Plaintiffs have relied heavily on the Alabama Attorney General's investigation and opinion
that Finley and Reaves did not commit any ethics violations.  The Attorney General's letter to
the AEC also included conclusions about the conduct of AEC employees during the investigation
and prosecution of the complaint before the AEC.  The Attorney General's opinions and
conclusions are **not** evidence and therefore have not been relied upon by this court.

[2] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the
case."  Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).  The facts are
recited in a light most favorable to Plaintiffs.

Declaration).

4.      Defendant Cynthia Raulston is a white female. She was a deputy district attorney with the Jefferson County District Attorney before she was hired by the AEC. At all relevant times, Raulston was General Counsel for the AEC.

5.      Defendant Byron Butler is a black male. Butler worked in the MPD from 2004 until July 2009, when he began work as an Enforcement Agent with the Alabama Alcoholic Beverage Control. In September 2013, he began work as Special Agent with the Alabama Attorney General. In February 2018, he began work as a Special Agent with the AEC.

B.      <u>Past connections between the Plaintiffs and Defendants</u>

1.      Reaves was the Sergeant assigned to Butler's Crime Reduction Unit at the MPD and "considered" one of the Unit's "supervisors" (doc. 144-36, Reaves' Declaration). The record is unclear as to when or how long Butler was assigned to the Unit, but he was employed with MPD between 2004 and 2009.

2.      The AEC investigated Finley in 2018.  Butler was assigned to the investigation. The AEC dismissed the investigation for lack of probable cause.  Plaintiffs believe that Butler held "hard feelings" or a "vendetta or grudge" against Finley and that he was "bitter" and took the dismissal "personally"[3] (doc. 135-1).

---

[3] Plaintiffs proffer the testimony of Peck Fox, Finley's attorney for the AEC investigation. Fox testified that "During the course of our discussion, Byron told me that he had -- that there had been an earlier complaint that involved Chief Finley … that the Commission, at that point, had found there was no probable cause, but that this one was going to be different and I needed to understand that my client was just a bad guy." (doc. 144-44, Excerpt of Fox deposition).  Fox testified that "I think 'bad guy' is exactly his words, but – but it has been four years – almost four years, so.  That gave me concern about – and that was, in large part, why I recommended to Chief Finley that we not sit for an interview with Agent Butler because I thought there was a predisposition there." (Id.).

C.    <u>Past connections between Defendants and the Complainant in the AEC</u>
<u>investigation of Finley and Reaves</u>

1.    MPD Lieutenant Marcus Webster filed the ethics complaint against Finley and
Reaves with the AEC (doc. 126-6, Complaint). Webster is black.

2.    Butler had worked with Webster on the Crime Reduction Unit at some time
between 2004 and 2009. The amount of time that Butler and Webster worked together on the
Unit is unclear.  Webster indicated "for about a year" (doc. 144-9).

3.    Butler saw Webster in the AEC office the day Webster filed his complaint (doc.
126-7, Exhibit G, Butler Declaration).  Butler stated that was the first time he had spoken with
Webster in several years (Id.).

4.    Webster estimated that he had not spoken with Butler for six or seven years
before the complaint was filed.  Webster also stated that ten years had passed since he and Butler
were in the same Unit (doc. 144-9, AEC Internal investigation witness summary).

D.    <u>Events prior to the AEC complaint against Finley and Reaves</u>

1. <u>The promotions</u>

On either June 25, 2020, or in July 2020, Finley promoted Reaves, a white female, to
Deputy Chief of Operations. At some point, Finley also promoted Zedrick Dean, a black male, to
Deputy Chief of Staff.  Both reported to Finley.

Finley testified that soon thereafter community leaders and black officers began to
complain about Reaves' promotion, Reaves' conduct, and Finley's conduct.  He believes that
black officers Dean, Denise Barnes, Saba Coleman, Tameka Armstead, and Ramona Harris
"started a campaign" to "get rid of" him and Reaves.  He believes that Denise Barnes was jealous
of Reaves' promotion (doc. 135-1, p. 4).

2. Lieutenant Ferguson and the choke hold

In August 2020, Reaves and other officers investigated a June 2020 incident involving Lieutenant Antavione Ferguson's use of a choke hold on a suspect. Reaves recommended a 20-day suspension, which Finley upheld. Ferguson appealed Finley's decision.

In October 2020, Mayor Reed terminated Ferguson based on the MPD's 2016 Use of Force Memorandum (zero-tolerance).[4] Ultimately, Ferguson filed a race discrimination action in federal court against the City. Ferguson v. City of Montgomery, No. 2:22-CV-607-ECM, 2024 WL 5056616 (M.D. Ala. Dec. 10, 2024) (granting summary judgment in favor of the City).

3. Off-duty employment investigation

In September 2020, the MPD received a complaint from a business about MPD officers who worked off-duty jobs (doc. 144-43). Overall, thirteen officers were investigated (doc. 144-15). Twelve were black and one was white (doc. 144-31, City Investigator Hudson, Affidavit).

On October 1, 2020, Reaves made a request to Finley for the City to investigate the five black officers under her supervision – Lieutenants Ferguson,[5] M.K. Webster,[6] J.K. Mackey, and Sergeants J.D. Harrison, and E.S. Ware – "for possible Ethical Violations and policy violations regarding off-duty employment" (doc. 129-11, p. 4). Reaves believes that the other officers were under Deputy Chief of Staff Dean's command except for one (doc. 144-43, p. 4).[7]

---

[4] Reed's decision was upheld on appeal in the state court system. City of Montgomery v. Ferguson, --- So. 3d ---, 2024 WL 4312133 (Ala. Civ. Appl. Sept. 17, 2024).

[5] Ferguson also filed an internal complaint against Reaves on September 30, 2020, and against Finley on October 23, 2020 (doc. 144-31, Hudson Affidavit).

[6] Webster testified that "Reaves and Ferguson" have a history and that Reaves has written up and/or investigated Ferguson in the past. Webster testified that "once that complaint came in, it was just another avenue that she used, and we were just kind of all pulled in to that investigation." (doc. 144-35, p. 9).

[7] Reaves testified that the officers reporting to Dean received different discipline because their

Reaves states that "City Investigations" completed their investigation in October 2020 (doc. 144-36, p. 3). For the five officers under her command, she recommended "a 20-day suspension and demotion in rank, that the case be sent to the Ethics Commission for review," and suspension from off-duty work for one year (doc. 144-43, p. 3, 5).

Finley attended a meeting with Mayor Reed and others,[8] wherein they discussed "the charges on the main five officers that were up for serious disciplinary violation" regarding off-duty employment (doc. 144-42, p. 13, Finley Deposition). Finley testified that the attendees agreed to termination for the five officers and after the meeting, he asked Reaves to prepare the "paperwork for termination" and to "forward the file to the Ethics Commission for investigation" (doc. 144-42, p. 13, 35).

Finley testified that later he received a call from the Mayor's Chief Administrative Officer, Jamyla Philyaw, who "said that a little birdie told her to go with option two and it didn't come from – it didn't come from the mayor" (doc. 144-42, p. 35). Finley directed Reaves to "redo the complaint with option two" – "twenty-day suspension, demotion, a year of suspension from work on all off-duty jobs as well as forwarding the complaint to the Ethic Commission for investigation" (doc. 144-41, p. 3). Finley also testified that he believed (but without any supporting evidence) that black pastors in Montgomery, including Butler, were meeting with Mayor Reed "in terms of displeasure for this black chief disciplining these black officers" (doc. 128-2, p. 8).

---

discipline would have been for Dean to recommend and "they weren't found guilty of ethics violations" (doc. 144-43, p. 4, Reaves' deposition).

[8] Mayor Reed's Chief of Staff Chip Hill, City Attorney Stacy Bellinger, City Investigator Bill Barousse, and Retired Montgomery Circuit Court Judge Price were present (doc. 144-42, p. 12-13).

On December 11, 2020, Finley provided a written "Recommendation for Disciplinary Action" to Mayor Reed as to all officers, but for three "unsubstantiated" complaints. Finley recommended "Termination" and an "Ethics Review Board request" for Ferguson who had already been terminated for the choke-hold conduct (doc. 144-15, 144-42, p. 56). For Webster, Mackey, Harrison and Ware, Finley recommended "demotion in rank, 20 days suspension, Ethics Review Board request, [and] [s]uspension of off-duty for 1 year" (doc. 144-15). The other officers, some of whom were supervised by Deputy Chief of Staff Dean, received recommendations for lesser punishment than did those supervised by Reaves (doc. 144-15; doc. 144-43, p. 4).

At least some of the officers, including Webster, appealed to the Mayor who upheld the punishment. The officers then unsuccessfully appealed to the City County Personnel Board. A hearing was held on June 30, 2021 (doc. 144-36, p. 6, Reaves declaration). Reaves was the City's witness regarding the actions against Webster. Reaves saw Butler in the audience of the private hearing (Id.).

Officers Ware, Harrison, and Webster filed suit against the City. They alleged that Reaves discriminated against them on basis of race because she treated similarly situated white officers more favorably. They also alleged retaliation because they voiced their support for Ferguson to Chief Finley. Ware v. City of Montgomery, Civil Action 2:21-00659-MHT-JTA (M.D. Ala. 2021); Harrison v. City of Montgomery, Civil Action 2:21-00716-MHT-JTA (M.D. Ala. 2021); Webster v. Montgomery, Civil Action 2:21-cv-00641-MHT-SMD (M.D. Ala. 2021). Summary judgment was entered in favor of the City as to all actions.

On March 4, 2021, the City sent the complaint against the five officers to the AEC (doc. 144-45, p. 9, Bellinger deposition; doc. 129-3, p. 4, Bellinger email to Brian Paterson, Assistant

General Counsel with the AEC). Between August and November 2021, Butler requested documents from the City (doc. 129-3). On December 16, 2021, the AEC, through Paterson, informed Bellinger that the cases would not be presented to the AEC and would "be closed by operation of law" (doc. 129-3, emails between Paterson and Bellinger).

### 4. Policies 2.311 and 3.2.4

Webster's ethics complaint alleged that Finley allowed Reaves and Finley's son a third attempt to meet firearms qualification in violation of MPD Policy 2.311. Two MPD Policies are at issue: "Firearms Qualifications" "Rules and Regulations" MPD Policy 2.311 effective September 11, 2012 (doc. 126-10) and "Annual-Biennial Proficiency Training" "Written Directive" MPD Policy 3.2.4, effective June 25, 2018, and as amended effective January 15, 2020 (doc. 126-10, p. 5; doc. 126-14 (amendments)). Policy 3.2.4 was implemented to rescind Policy 2.311 (doc. 126-10, p. 5).[9] However, Policy 2.311 was not archived and remained active in the PowerDMS online portal, a database accessible by all MPD personnel (doc. 132-4, Lieutenant Carson Interview, Under Seal).[10]

Policy 2.311 required an officer to score no less than 76 in handgun qualifications held twice a year (doc. 126-10). An officer who failed to qualify in the initial attempt would be given a second opportunity to pass (Id.). If the officer failed to score at least a 76 in one of the two attempts, the officer would be given an official failure (Id.). Policy 2.311 set out progressive discipline ranging from a "Counseling Form" and "Loss of off-duty employment until" a remedial class was passed, through "Termination", depending on the number and time frame of

---

[9] "New/Amends/Rescinds: Rescinds … 3.211 Dated 9-11-12" (doc. 126-10, p. 5).

[10] Carson believed that Policy 2.311 "was the only thing that we had to go on for our firearms qualifications" (doc. 132-4, p. 5, Under Seal).

past failures to qualify (Id.).

Policy 3.2.4 resulted from the MPD's attempt to qualify under the Commission on Accreditation of Law Enforcement Agencies (CALEA) (doc 144-45, Bellinger deposition, p. 5-7; doc. 144-5, Dean deposition (CALEA generally)).  Policy 3.2.4 still required an officer to score no less than 76 in handgun qualifications, allowed a second opportunity to pass, and remedial training upon failure (doc. 126-10, p. 6).  The penalties or "Corrective Actions" were found in the Progressive Schedule for Disciplinary Action (doc. 147-8, Under Seal).  The "Corrective Action" for a "Minor Infraction" such as failing the firearms qualifications, begins with "1st Step Informal Discussion / Employee Counseling" and ranges to "6th Step" suspension, demotion or termination. The Schedule explains

> For the purpose of determining the next corrective action, these offenses roll off every 12-month period.  For example: An employee is on Step 4 of a Category A violation and has received an 8 hour suspension. The next minor violation will be a 40 to 120 hour suspension, if Steps 1, 2, 3 and 4 are still within the past 12 months.  If not, the corrective action drops back to Step 3" – Letter of Reprimand."

(Doc. 147-8, Under Seal).

Effective January 15, 2020, Policy 3.2.4 was amended but carried the same requirements for qualification, a score of no less than 76 in one of two attempts, and a non-qualifying officer must successfully complete remedial training before resuming official duties (doc. 126-14).

On November 3, 2020, the handgun qualification policy was amended on Finley's order to lower the qualifying score from 76 to 70 and provide that officers would have three attempts to qualify (doc. 126-10, p. 12; doc. 126-14, p. 10).  At some point after November 3, 2020, PowerDMS was updated and Policy 2.311 appears to have been archived (doc. 132-4, p. 6, Under Seal).

When a new policy or a policy change is added to PowerDMS, the officers are notified electronically to log-in to the system and review the changes (doc. 144-33, p. 8, Transcript of Butler and Webster telephone conversation, April 16, 2020).  The officers electronically sign when they have reviewed a policy (Id., doc. 144-17, excerpt from MPD sign-in logs).[11]

Multiple MPD personnel relied upon Policy 2.311 as the operative policy for the October 2020 qualifications. On September 9, 2020, Sergeant Matthew W. Hoffman, the rangemaster, through his assistant Catherine Washington, emailed a memorandum regarding the "2020 Departmental Handgun Inspection, Use of Force Updates, and Qualifications" explaining that same would be conducted from Monday, October 19, 2020 through October 22, 2020, with Friday, October 23, 2020 reserved for eight-hour remedial training (doc. 126-6).  Hoffman stated that he attached a copy of Policy 2.311 to the memorandum (doc. 132-5, p. 4, Under Seal).  He also stated that Policy 2.311 was available to all personnel on PowerDMS.  Although Hoffman believed a copy of Policy 2.311 was attached to his memorandum, it was not.[12]

On October 20, 2020, Chief of Staff Dean sent an email to the officers in his command asking them to "remind any of your personnel who failed qualification will not be able to work off-duty jobs until they clear remedial" (doc. 129-1, p. 12).  Dean was referring to penalties in Policy 2.311 because he believed it was the policy in effect as of October 2020 (doc. 129-16, p. 3, Dean deposition).

Lieutenant Webster relied upon Policy 2.311 when he filed his complained against Finley

---

[11] Plaintiffs assert that this document is evidence that Webster knew about Policy 3.2.4 because he signed the log.  The document shows multiple signatures, including Webster's, for July 17, 2018 and June 21, 2018, but does not indicate the policy or information the officers reviewed. June 21, 2018 corresponds with Policy 3.2.4's effective date of June 25, 2018.

[12] During the AEC's internal investigation, Butler told Investigator Lansford that after the witness interviews, he learned that Catherine Washington, Hoffman's assistant, sent the email, and that the memorandum was attached, but not Policy 2.311 (doc. 144-7, p. 10).

and Reaves.  He attached a copy of Policy 2.311 to his AEC complaint (doc. 126-6, p. 6) and his complaint to the City (doc. 132-2, p. 5, Under Seal).

### 5. Reaves' October 20, 2020 Firearms Qualification

During the week of October 19, 2020, MPD held an annual firearms qualification.  On October 20, 2020, Reaves and Finley were at the firing range when Reaves failed her first two attempts (doc. 144-36, Reaves declaration). She told Finley that she would attend the remedial training "later in the week" (Id.). Finley told her to shoot again and that everyone would get a practice round if needed.  Reaves heard Finley tell Sergeant Killough "the same information" (Id.).  Killough oversaw the firing line.[13]  She qualified on her third round (Id.).  Reaves denies asking Finley or Dean if she could make a third attempt (doc. 144-36, p. 4, Reaves declaration).

Finley testified that before he heard Reaves had failed, and before he told Reaves to make the third attempt, he had talked with Sergeant Killough about allowing a third attempt (doc. 144-42, p. 39).  He did so because "a large number of officers … didn't qualify" the previous day,[14] and he had already considered changing the policy (Id., p. 40-42). When Finley told Killough to allow Reaves a third attempt, he said to Killough "in essence" to count the first attempt as a

---

[13] Plaintiffs assert that under Policy 3.2.4 which applies the Progressive Schedule for Disciplinary Action, Reaves would have been subject to the first level of discipline: A "Form 28 write-up, considered a minor violation, which rolls off an officer's record in 12 months" (doc. 135-1, p. 9; doc. 147-8, Under Seal).

Policy 2.311 included all failures from December 1, 2005, forward.  Defendant Butler represented to the AEC that the October 2020 failure would have been Reaves' fourth and she was subject to three days suspension and loss of her take-home vehicle for six months. Butler clarified that Reaves did not have an off-duty job at that time (doc. 147-7, p. 11, AEC hearing transcript, Under Seal).

[14] On Monday, October 19, 2020, seven out of seventy officers failed (doc. 132-5, p. 11, email attached to Hoffman's witness statement, Under Seal).

practice and "give these officers the opportunity to qualify on the third attempt" and "the last thing that I said is that we don't advertise, and what I mean by we don't advertise, let them do their best effort and then if – and then allow them a third attempt." (Id., p. 41).

6. Detective Thomas' October 21, 2020 Firearms Qualification

No other officer received a third attempt until the next day, October 21, 2020, when Santrella Thomas, a homicide detective, failed after two attempts (doc 132-5, p. 6, Hoffman Statement, Under Seal). Thomas was told she would have to return October 23, 2021 for the 8-hour remedial training (Id.) However, because Thomas had her first court hearing on a homicide that day, Killough allowed a third attempt,[15] which she passed.  Hoffman questioned this decision and contacted Lieutenant Carlisle for guidance (Id.).  Carlisle told Hoffman that the third attempt was not valid, that Thomas would shoot again on the scheduled remedial day, and that Captain Miliner would talk with the officers involved (Id). Hoffman continued under Policy 2.311, as did other officers on the range (Id.).

7. The email to all non-qualifying officers

Later that night, on October 21, 2020, at 10:59 PM, Captain Miliner sent an email to all officers who had failed as of that afternoon. Miliner wrote: "Per Chief Finley, everyone on this list will be given an opportunity for one more attempt to qualify on Thursday, October 22, 2020" (doc. 132-5, p. 15, Hoffman Statement, Under Seal).[16]

---

[15] Killough stated he told Sergeant Caffey to "let her shoot" a third time (doc. 144-52, p. 1). He did not remember Caffey referencing Reaves' third attempt.  He did recall that they discussed Thomas' situation and whether that was a "need" for a third attempt as indicated by Finley's statement to Killough that if anyone needed a third attempt, to allow it.

[16] Later, on Bellinger's advice, Finley required all officers who were given a third attempt and qualified or failed to attend remedial training in December 2020. However, no officer received a disciplinary (docs. 127-1; 126-6, p. 27-28; 129-1, p. 2-3; 144-45, p. 4; 135-1, p. 8; 104, p. 12).

8. Form 28, the Employee Counseling Record

Form 28 is used to record counseling and discipline of the officers. The Form has a box for the superior officer to describe the conduct, a box to describe the counseling and discipline imposed, and a line for the officer and superior officer to sign. The Forms may be placed in the officers' personnel file.

Major Denise Barnes testified that some forms were prepared in October 2020 as to the officers who failed to qualify after two attempts. (doc. 129-8, p. 18, Barnes deposition). Ultimately, Barnes and the other superior officers received notice from Chief Finley that "nobody would receive the write-up because of I guess the issues that we had at the range with changing the --- the qualifying score from 70 – from 76 to 70" (Id.) and the confusion around the change to allow a third attempt to qualify.

9. Webster's complaint to City Investigations

Webster was not present and did not see Reaves shoot (doc. 144-35, p. 2, Webster deposition). He went to the range on October 22, 2020 for his firearms qualification (Id). Corporal Jasmine Pace testified that on October 22, 2020, she told Webster that Reaves had failed and that "people were written up for the exact same thing" which was unfair (doc. 132-8, p. 4, Pace Statement, Under Seal).

On October 23, 2020, Webster filed a complaint with City Investigations alleging that Finley abused his authority because he changed the policy for Reaves at her request and for her benefit (doc. 144-36, p. 5). City Investigations determined that the complaint was "unfounded" because Finley had "executive authority to make changes" to policies (doc. 132-2, p. 5, Barousse Statement, Under Seal).

E.    Webster's complaint to the AEC

13

On November 3, 2020, Webster filed his complaint against Reaves and Finley with the AEC (doc. 126-6).  He alleged that Finley's changing the policy to allow Reaves to shoot a third time was a "clear abuse of power" and violation of MPD policy (Id., p. 4-5).  Webster wrote that "[b]ecause of this many officers began to express their frustration because of the special treatment that was being showed to Deputy Chief Reaves, which many felt was because of her title.  Based off this action, the Range Staff had to reach out to those officers who did not qualify before Deputy Chief Reaves and have them come out and shoot the course again giving them a third attempt." (Id., p. 5).

Webster believed that Reaves had not received a disciplinary for her failure and as a result he contacted his superior, Major Barnes, and questioned[17] his obligation to discipline Officer Richardson for failing to qualify.[18] (doc. 144-35, p. 3).

 Webster summarized this in his Complaint:

> On Tuesday, October 27, 2020, I received an email from Major Barnes asking for all disciplinary paperwork for the officers who had to attend the remedial training for firearms qualification be turned in no later than Friday, October 30, 2020. I contacted Major Barnes and advised her that I wanted to submit a rebuttal letter due to me not agreeing with the disciplinary action being taken. After submitting the letter to Major Barnes I was informed on Friday, October 30, 2020, that the Montgomery Police Department would not be issuing any disciplinary action against officers for the 2020 Department Qualifications.

(Doc. 126-6, p. 5).

Webster supplemented his ethics complaint on November 10, 2020 (doc. 126-6, p. 22-

---

[17] "I would like to know how can we discipline Detective Richardson when it appears the policy was changed to help Deputy Chief J.M. Reaves avoid discipline?" (doc. 126-6, p. 10).

[18] On October 21, 2020, Richardson failed to qualify after his first and second attempt (doc. 126-6). He was given a third opportunity on October 22, 2020, but failed again (Id., p. 10; doc. 132-5, p.14, list of officers scheduled for remedial training October 23, 2020, Under Seal).

25).  He added a complaint regarding the fact that Finley's son was allowed a third attempt at handgun qualification. He attached the October 21, 2020 email from Captain Miliner to all the officers who had not passed their firearms qualification, including Finley's son, which stated they would have one more attempt to qualify the next day (Id., p. 18, 24). On April 16, 2021, Webster emailed to Butler, a copy of the Form 28 disciplinary action for Officer Richardson which Webster had prepared but was never placed in his personnel file (Id., p. 30).

 F. The AEC investigation and prosecution

 Albritton was not personally involved in the AEC investigation (doc. 126-1).

 Butler was assigned by "AEC legal staff" to investigate Webster's complaint (doc. 126-7, Butler declaration; doc. 144-2, p. 5, Raulston deposition). Raulston testified that she was out of town for a training session with Paterson when Special Investigator April Inness called and told Raulston the complaint had been filed (doc. 144-2, p. 5-6). Raulston recalled she was told that Finley had changed the policy to benefit Reaves and Finley's son, but she could not recall who told her (Id., p. 5-7).

 In January 2021, Butler sent correspondence to Montgomery City Attorney Stacy Bellinger requesting records pursuant to the AEC's investigative authority (doc. 126-8). Specifically, he requested the MPD policy for firearms qualifications, in place as of September 2020, with any revisions; records regarding the October 2020 firearms qualifications; and the personnel files of Finley, Finley's son, and Reaves.  In February 2021, Bellinger produced the City's documents and identified the relevant policies as "MPD Policy 9.11" and "MPD Policy 11.3.2020," both of which are Policy 2.311 (doc. 126-9; doc. 126-10, Policy 2.311).

 On April 7, 2021, the AEC approved a 180-day extension of the investigatory period in the Finley and Reaves cases (doc. 126-11).  On April 9, 2021, City Attorney Bellinger met with

Butler (doc. 126-12). They discussed language in Policy 2.311 stating that it did "not negate or dissolve past qualification failures on record as of 12-01-2005" (Id.). On April 14, 2021, Butler emailed Bellinger and requested versions of the firearms qualifications policies before September 11, 2012, when Policy 2.311 became effective, and information on any pending or resolved City investigations of Finley (doc. 126-12, p. 3). Bellinger contacted Lieutenant Carson, the officer in charge of maintaining the policies (id., p. 2).

On April 15, 2021, Bellinger called Butler and told him the City had located Policy 3.2.4, which was promulgated in 2018 and purported to rescind Policy 2.311. Following that call, Bellinger sent Butler an email on April 16, 2021, stating:

> Having said that, …Lt. Carson … located an additional current policy addressing firearms qualifications. In 2018, MPD was updating policies to become CALEA certified. To that end, MPD issued Written Directive 3.2.4 Annual-Biennial Proficiency Training dated June 25, 2018. … That directive states that it rescinds Policy 2.310 and 2.311 dated September 2012. However, 2.310 and 2.311 remained active in the system and were attached to a memorandum sent by the range master prior to October 2020 qualifications. … Lt. Carson also updated Policy 2.311 on November 3, 2020. … Written Directive 3.2.4 has also been updated twice since June, 2018, one in January, 2020 … and again in November, 2020.

(Doc. 126-12, p. 2).

Bellinger testified that she believed Policy 2.311 was attached to the memorandum sent by the range master because "that's the way it appeared in the city investigation file" (doc. 127-1, p. 10). Bellinger also testified that if she found out that Policy 2.311 had not been attached, she would have told Butler (Id.). Bellinger never emailed or called Butler to advise him that policy 2.311 was not attached to the memo (Id.). From April 16, 2021 until the AEC hearing in August 2021, Butler "never received any information suggesting that Bellinger was wrong, or that Policy 2.311 was in fact not attached to" Hoffman's memorandum (doc. 126-7, p. 4, Butler declaration).

16

On April 16, 2021, Butler talked with Webster about the two Policies (doc. 144-33). Webster stated that he found two policies in Power DMS: Policy 2.311, effective September 11, 2012, and as amended on November 3, 2020 (Id.). Webster explained that he printed the two policies from PowerDMS and attached them to his complaint. Webster referred to these policies as "the only thing they had in the system under qualifications".  Webster then asks - "So there's a different policy?" and Butler answers "yeah" (Id., p. 4). Later in the conversation, Webster stated: "And I didn't see -- honestly, like I didn't know the policy has changed -- it didn't -- and I guarantee you, nobody knew that the -- the so-called policy changed when we went under CALEA." (Id., p. 6).[19]

On April 18, 2021, Butler requested additional information from the City regarding the policies, discipline taken under both Policy 2.311 and 3.2.4 including "employee counseling forms (Form 28)," and emails about these Policies, since 2017 (doc. 127-2).

On May 12, 2021, Bellinger provided Butler a link to the requested City documents in response to his April 18 request (doc. 127-3). Richardson's Form 28 which Webster had provided was not in the MPD records. However, the responsive documents indicated that another officer - C.M. Williams - received a Form 28 under Policy 2.311 for failing to pass the October 2020 firearms qualifications and his Form 28 was in the MPD records (doc. 127-4).[20]  The documents also indicated that in May 2019 officers had received Form 28s under Policy 2.311

---

[19] On April 16, 2021, Webster e-mailed Butler two screenshots, which appear to be from Power DMS. One shows the November 3, 2020 amendment to Policy 2.311 and the other shows links to Policy 2.311 "Firearms Qualifications" and Policy 3.2.4 "Annual-Biennial Proficiency Training" (doc. 126-6, p. 31-32).  The Proficiency Training covered more than firearms.

[20] Officer Williams' Form 28 appears to be the only one that was in a personnel file after the October 2020 qualification. During the AEC hearing, Peck Fox, Finley's counsel, indicated that he would follow-up on removing this disciplinary (doc. 147-7, p. 38, Under Seal).

and Policy 3.2.4.[21]

On May 11 and 13, 2021, Raulston and Butler conducted formal interviews with MPD officers and City Investigator Barousse (docs. 132-2 through 8, Witness' Statement, Under Seal; docs. 144-48, 49, 50, 51, 52, Not Under Seal).  Butler and Ralston used a redacted version of Richardson's Form 28, during the witness interviews. Butler and Raulston represented to the witnesses that the Form 28 was in Richardson's file, but it was not (doc. 127-4, documents produced by the City; doc. 126-6, p. 5, Webster's complaint).

Raulston and Butler also questioned the witnesses as to Policy 2.311.  Lieutenant Carson, who was responsible for updates to the PowerDMS system, testified that Policy 2.311 had not been rescinded in PowerDMS, that Policy 3.2.4 would not be found on a search for "firearms", and "if you just search for firearms, the only thing you were going to get was 2.311 every time." (doc. 132-4, p. 4, Carson Statement, Under Seal; doc. 144-50, p. 2). Sergeant Hoffman, the rangemaster, testified (incorrectly) that he e-mailed a memorandum regarding the forthcoming firearms qualifications, and attached a copy of Policy 2.311 to the memorandum (doc. 132-5, p. 4, Under Seal).  Hoffman also stated that Policy 2.311 was available to all personnel on PowerDMS. City Investigator Barousse testified that the City "got a copy" of Hoffman's memorandum with Policy 2.311 attached, which he produced from his file, but the City did not "get the emails" (doc. 132-2, Under Seal).  Butler and Raulston relied upon Policy 2.311 as the operative policy when questioning the witnesses even though Butler had been told by Bellinger in an email on April 16, 2021, that Policy 2.311 had been rescinded by Policy 2.3.4.

---

[21] For the May 2019 firearms qualification, fifteen officers failed to qualify. Nine Form 28s referenced Policy 3.2.4, four Forms referenced Policy 2.311, and two Forms did not reference a policy (doc. 144-53).  Both indicate the officers would first attend an 8-hour remedial training session and if they failed, they would attend a 40-hour remedial training session.  This discipline is in both policies.

On May 20, 2021, the AEC, through Butler, sent Finley and Reaves "45 Day Letters" informing them of the nature of the complaint and the pending hearing (doc. 127-5, p. 1-5). Reaves was informed that the

> allegation is that you used your official position to obtain personal gain for yourself and solicited other public employees of the [MPD] to use public equipment facilities, time, materials, and human labor for your private benefit, which would materially affect your financial interest, contrary to the [MPD] Rules and Regulations Policy 2.311 Firearms Qualifications that was to be followed for your qualification. As a part of this request, public employees were directed by a supervisor to score an additional qualification round for you using ammunition purchased by the [MPD] and the firing range owned by the [MPD] so that you could avoid the disciplinary action required by agency policy.

(Doc. 127-5, p. 2). Finley was informed that the

> allegation is that you used public equipment facilities, time, materials, and human labor for the private benefit of an employee of the [MPD] which materially affected his or her financial interest, contrary to contrary to the [MPD] Rules and Regulations Policy 2.311 Firearms Qualifications that were being followed on the day of qualification. Specifically, it is alleged that you directed subordinate staff to score an additional qualification round using ammunition purchased by the [MPD] and the firing range owned by the [MPD] to avoid taking the disciplinary action required by agency policy.

(Doc. 127-5, p. 4).[22]

On June 15, 2021, the City retained Peck Fox to represent Finley and Barbara Wells to represent Reaves. Fox and Wells obtained discovery from the AEC, including copies of Policies 2.311 and 3.2.4, and disciplinary files (docs. 127-6, emails between Fox and Bellinger; doc. 127-8, Peck deposition; doc. 127-9, Wells deposition).

---

[22] Ala. Code Sections 36-25-5(a), (c), and (d), apply to circumstances where a public official or public employee uses their official position or office for personal gain, uses public property for private benefit "which would materially affect his or her financial interest", or "solicit a public official or public employee to use" public property for that person's private benefit, "which would materially affect his or her financial interest…" (Id.).

Finley testified that he told Fox "there was no umph in the new policy [Policy 3.2.4] because we took out the – the loss of off-duty employment" (doc. 128-2, p. 5). Fox testified that he knew that Policy 2.311 had been "arguably" but maybe "ineffectively" rescinded prior to October 2020 but decided not to argue to the AEC that it was not in effect. Fox based this decision on conversations which "led" him to "believe" that officers at the MPD "believed" it was still in effect, and because Finley amended Policy 2.311 on November 3, 2020, after the October 2020 qualifications (doc. 127-8, p. 6-8). Wells testified that she "accepted Mr. Butler's representation about the policy" and did not argue that Policy 2.311 was ineffective because of the rescission (doc. 127-9, p. 5-6, Wells deposition).

Fox and Finley were provided Sergeant Killough's Statement regarding why Finley changed the policy (i.e., because so many officers failed). Raulston believed it might be exculpatory in that it potentially negated Finley's intent (doc. 126-2; doc. 132-7, Under Seal). No other witness statements were provided to Fox or Wells. Fox and Wells were provided limited discovery (doc. 128-1, Respondents acknowledgement of receipt of discovery).

Butler's investigative report and the relevant supporting evidence, including the redacted Form 28 and Policy 2.311 were sent to the Commissioners prior to the hearing. The entire file was available to the Commissioners (doc. 126-1, Albritton Declaration; doc. 126-2, Raulston Declaration).

On August 4, 2021, Butler and Raulston presented the case to the AEC. Fox and Wells made their presentations (doc. 147-7, Under Seal, Transcript, executive session and open session). Raulston and Butler represented to the AEC that Policy 2.311 was in effect and that Reaves was subject to disciplinary action under that Policy. Specifically, a three-day suspension and loss of a take-home car for six months (Reaves did not have an off-duty job), which would

materially affect Reaves' financial interests. Raulston and Butler represented that discipline forms had been written on non-qualifying officers, while Reaves was allowed a third attempt to qualify and did not receive a discipline. Raulston and Butler also represented that those discipline forms were later removed from the officer's personnel files by Chief Finley.  Butler represented that the complainant (Webster) did not want to discipline a non-qualifying officer, because Reaves had not been disciplined, but believed he had to do so.

During the open session, the AEC voted 4 to 0 that "there exists cause to hold that" Finley and Reaves had each committed one minor violation of the Ethics Act ((doc. 147-7, Under Seal, p. 79-82, Transcript of open session).  The AEC also voted that the cases be "handled administratively" and "referred for review and appropriate legal action" to the Attorney General (Id.). Neither Finley nor Reaves made any statement to the AEC, either prior to or during the hearing.  Administrative Resolutions for Finley and Reaves were sent to the Attorney General.

At this point Finley had resigned on June 8, 2021. Reaves was still employed with the MPD but subsequently was reassigned as Municipal Jail Commander Major effective August 20, 2021 (doc. 129-15, p. 5).  She took FMLA leave on October 6, 2021, and retired August 30, 2022 (doc. 104, p. 19-20).

In November 2021, the Attorney General, by letter, notified the AEC that he disapproved the proposed Administrative Resolutions for Finley and Reaves (doc. 147-5, p. 2-3, Under Seal; doc. 126-1, Albritton declaration). The Attorney General also included unfavorable conclusions about the conduct of Raulston and Butler during the AEC investigation and prosecution. (Id.)

The AEC conducted an internal investigation.  On April 6, 2020, after the investigation was concluded, the AEC wrote two letters to the Attorney General concerning the conclusions as

to the conduct of Raulston and Butler.  The AEC states that it did not find any misrepresentations of fact and that none of the issues raised by the Attorney General (and, by extension, Plaintiffs) would have made any difference to the outcome of the proceedings (doc. 132-10, Under Seal).

On July 13, 2022, the AEC issued Advisory Opinion No. 2022-03, stating that the AEC "is not required or permitted to disclose exculpatory information or Brady material to respondents of complaints filed with the Ethics Commission" (doc. 129-4).  Previously, the Attorney General had conveyed the conclusion that the AEC was "legally obligated to produce exculpatory and impeachment evidence to all respondents" before the AEC (Id.). The AEC took the position that this conclusion conflicted with the relevant Alabama statutes and Administrative Rules for the AEC which "required that all materials filed with the AEC or discovered during an investigation be kept confidential pursuant to Alabama's Grand Jury laws" (Id.).[23]

On November 28, 2022, the Attorney General sued the AEC in the Montgomery County Circuit Court, State of Alabama ex rel. Marshall v. Alabama Ethics Commission, et al., Civil Action No. 03-CV-2022-901464.00, seeking a declaratory judgment that the AEC's Advisory Opinion was void because it was an administrative rule issued in violation of the Alabama Administrative Procedures Act. (doc 129-5).

Before any substantive rulings, the litigation became moot when Ala. Code § 36-25-4.4 was passed in 2023. The Code specifically clarified what must now be disclosed to the respondent.  Specifically, "… the complaint together with any statement, evidence, or information received from the complainant, witnesses, or other individuals or discovered in the

---

[23] Ala. Code § 36-25-4(d) provides that "Upon the commencement of any investigation, the Alabama Rules of Criminal Procedure as applicable to the grand jury process promulgated by the Alabama Supreme Court shall apply and shall remain in effect until the complaint is dismissed or disposed of in some other manner."

course of the investigation" which the respondent shall keep "confidential until the conclusion of any proceedings before the commission or any resulting prosecution." Ala. Code § 36-25-4.4(a). Also, if evidence believed to be exculpatory is disclosed "… neither the commission nor its employees are liable for violating the restrictions relating to secrecy and nondisclosure of information provided in subsections (c) and (d) of Section 36-25-4." Ala. Code § 36-25-4.4(c).

G.    Other events after the AEC complaint

1. Sergeant Thagard's complaint

On January 13, 2021, Sergeant J.D. Thagard filed a complaint with City Investigations against Finley (doc. 129-10). [24]  The complaint alleged that Finley violated City policy on Protected Communications and Anti-Retaliation when he denied Thagard's request to meet with Mayor Reed concerning a hostile work environment complaint against Lieutenant A.C. Carlisle (Thagard's supervisor) and reassigned Thagard to a different department (Id.)

City Investigations investigated the complaint and substantiated the allegations that Finley violated the Protected Communications and Anti-Retaliation policies (Id., p. 19).  Thagard was transferred back to his department. [25]  Because Thagard had also complained about City

---

[24]  Plaintiffs allege that after the April 6th City Council Working Session, at which police officers voiced their complaints, Mayor Reed reopened the investigation of Thagard's complaints (doc. 135-1, p. 21-22).  Finley testified that City Investigations had found his complaint unsubstantiated (doc. 144-42, p. 29-32) ("The initial investigation … against myself was cleared by City Investigation").  Finley is incorrect. City Investigations found the complaint substantiated and that Finley had violated the Protected Communication and Anti-Retaliation policies (doc. 129-10, p. 19). Also, the investigation does not appear to have been "reopened" because of the complaints at the Working Session. Instead, the investigation continued.  On March 22, 2021, City Investigator Barousse declined to sign the City report because Thagard had also complained that City Investigation would not correctly investigate the complaint (doc. 129-10, p. 4); see Finley v City of Montgomery, Civil Action No. 2:23-00146-KKD-PDM, (M.D. Ala. 2023) (Doc. 115-19, p. 24). The outside investigator was retained April 9, 2021 (Id.).

[25]  Thagard expressed his dislike of Finley and testified that "he is the worst one this police department has ever had, the worst one, and we are suffering from that right now…. I love the

Investigations, City Investigator Barousse declined to sign the report. On April 9, 2021, the City hired an outside investigator.  On April 29, 2021, the investigator issued her finding that Finley violated the Protected Communications and Anti-Retaliation policies. [26]

    2. The April 6, 2021 City Council Work Session

At the Working Session, MPD officers including the officers investigated for off-duty employment violations, and other citizens including Pastor Ed Nettles, complained about the MPD, including Finley and Reaves[27] (doc. 129-12, p. 37-42, Nettles' deposition; doc. 144-36, p. 6).  Butler was in the audience (doc. 144-36, p. 6, Reaves declaration).  Finley told Reaves that Mayor Reed instructed that they could not respond to the allegations against them (Id.).  Reaves and Finley were humiliated (Id.) (doc. 144-42, p. 24-25).   The session "was open to the public and recorded for media purpose where it was also published" (Id.).

Nettles testified that he did not "recall anyone bringing up race" or that Reaves had received "special treatment or special favors because she was white" (doc. 129-12, p. 52). Nettles spoke about the "morale" at the MPD and that "the officers did not feel that they were being treated appropriately", including Nettles' son (Id., p. 37-39).  He also testified the officers

---

Montgomery Police Department through and through. And I doggone hate the day they hired his behind" (doc. 128-9).  Thagard disliked Finley's treatment of a white officer who was prosecuted for killing a black male (Id., doc. 104, p. 15).

[26]  Defendants filed Bellinger's memorandum to Mayor Reed through Chip Hill wherein Bellinger states that the outside investigator's report is attached (doc. 129-10).  However, only the City Investigation report was attached. The outside investigator's report is found at Doc. 115-19 in Finley v City of Montgomery, Civil Action No.2:23-00146-KKD-PBM (M.D. Ala. 2023).

[27] Plaintiffs allege that "Reed invited four demoted and two terminated police officers to join him at City Hall for the working session of the City Council on April 6, 2021" (doc. 135-1, p.  21, Statement of Undisputed Facts).  In support, they cite to the Agenda (doc. 144-28, p. 2). The section captioned "New Business", contains the following: "22. Individual Police Officers to address Council regarding Operational Concerns. (Sponsored by Council-as-a-Whole)" (Id.).

believed that "disciplinary actions were not consistent" and that favor was shown toward some officers but not others who committed similar offenses (Id., p. 53).

Nettles denied meeting with Mayor Reed and other "black pastors" about Finley and denied that the "black pastors" had discussed Finley (doc. 129-12, p, 102).  Nettles had interacted with Finley and Reed, in Nettles' capacity as a volunteer liaison with the City's Office of Violence Prevention (Id., p. 15).  Nettles did not know Reaves and had only spoken with her twice (Id., p. 40).  Nettles did not know Butler or that Butler was a pastor (Id., p. 58-59).

    3. Butler's and Raulston's alleged communications with Mayor Reed

Mayor Reed testified that he did not know Butler and did not remember any presentation about information Butler planned to present to the AEC (doc. 129-13, p. 3).  When questioned whether he partnered with Butler to obtain Finley's resignation, Mayor Reed testified that he "didn't partner with anybody." (Id., p. 10).  Reed testified that when he asked Finley to resign: "I don't remember what I said, but it had nothing to do with the ethics investigation at all.  It had everything to do with those things that we discussed earlier, the morale, the performance, the perception, time in the office, those things." (Id., p. 11). Mayor Reed testified that he did not know who filed the AEC complaint about the firearms qualifications, did not talk to the City Investigator about the City's investigation of the complaint about the firearms qualifications, and did not know about the content of the ethics complaint at that time (Id., p. 12).

Reed testified that he did not know Raulston (Id., p. 4). He had met Albritton in official meetings and had heard him speak (Id., p. 4-5).

    4. Reaves' complaint against her officers

In April 2021, Reaves filed a complaint with City Investigations against two black female subordinates, Major Tomekia Armstead and Major Denise Barnes. Reaves alleged hostile work

environment and discrimination towards her, insubordination, and poor performance (doc. 129-6). Reaves reported a series of events starting in August 2020 (after her promotion).  City Investigations found the complaint "unsubstantiated" because "as a supervisor" Reaves had authority to address the alleged bad behavior (Id., p. 14).

     5. Finley's resignation, Harris as Interim Chief, and Reaves' retirement

     After the Working Session meeting on April 6, 2021, Mayor Reed discussed the issues presented with Finley (doc. 129-13, p. 6, Reed deposition). Ultimately, Reed gave Finley a resignation letter and Finley resigned June 8, 2021 (doc. 144-42, p. 3-4, Finley deposition). Finley testified that he resigned "forcefully under duress, under threat and intimation" (Id., 3). Dean became Acting Chief and then Ramona Harris became Interim Chief of Police (doc. 129-14, Harris Deposition).

     Interim Chief Harris reorganized the MPD.  She returned to one deputy chief position, retaining Dean as Deputy Chief of Staff (Id.).  On August 5, 2021, Harris sent a memorandum to Mayor Reed regarding Reaves' performance (doc. 129-15).  On August 12, 2021, Harris sent a memorandum to Mayor Reed stating that she had reassigned Reaves to her former position as Municipal Jail Commander Major, effective August 20, 2021.  Harris wrote that "[t]his staffing decision is not considered nor qualifies as a demotion due to the Chief of Operations position being laterally qualified as a Major position by rank designation." (Id., p. 5). Reaves took FMLA leave on October 6, 2021, and retired August 30, 2022 (doc. 104, p. 19-20).

     H.    The Alabama Ethics Commission

     1.    The AEC is a five-member appointed body, subject to confirmation by the Senate, with a full-time director, also subject to Senate confirmation. Ala. Code § 36-25-3. The director is charged with hiring legal counsel and other staff, including a maximum of eight "full-time

investigators who shall be and are hereby constituted law enforcement officers of the State of Alabama…" <u>Id</u>.

2.      The AEC has a broad range of statutory duties related to the enforcement of the Alabama Code of Ethics for Public Officials, Employees, Etc. (Ethics Act) and the Alabama Fair Campaign Practices Act, including education, regulation, and investigation (doc. 126-1, Albritton declaration, ¶ 5); Ala. Code § 36-25-4.

3.      A complaint must be submitted in writing by any person whose identity has been verified. A complaint can only be filed by a person with "credible and verifiable information supporting the allegations" which has never been interpreted as requiring first-hand knowledge. (doc. 126-1, ¶¶ 6-7)

4.      All complaints are subject to an initial review to determine whether they allege facts that, if true, would constitute a violation of the Code and that reasonable cause exists to conduct an investigation. Complaints are then assigned to an investigating agent. Each special agent generally handles a territory comprised of adjoining counties (doc. 126-1, ¶ 8).

5.      All special agents are required to be APOSTC[28] certified. All agents are experienced officers who are given substantial discretion to investigate complaints. They are directly supervised by the Chief Special Agent, but agents are also free to discuss a case with senior supervisory staff, or even to go directly to Albritton if necessary (doc. 126-1, ¶ 9).

6.      The AEC may request records from public agencies. All agencies "shall cooperate in every possible manner in connection with any investigation or hearing…" Ala. Code § 36-25-17. The AEC may also subpoena witnesses and require the production of books, papers, documents, and other evidence from private persons and entities (doc. 126-1, ¶ 10).

---

[28] Alabama Peace Officers Standards and Training Commission (APOSTC).

7.      The AEC has 180 days to determine whether probable cause of a violation exists, or the complaint is dismissed as a matter of law. Staff may request an additional 180 days to complete an investigation for good cause. A list of all extensions that are being requested during a particular meeting is compiled by staff and then formally presented by Albritton to the AEC in executive session, and the AEC approves or disapproves each such request in executive session (doc. 126-1, ¶ 11).

8.      After the investigation is complete, the case agent drafts a report with exhibits for submission to the AEC. The report is reviewed first by the Chief Special Agent to assess whether additional investigation is needed. Once the report is preliminarily approved, it is sent to senior supervisory staff, and then to the Director. Senior supervisory staff review the agent's summary of the exhibits in reviewing the analysis of potential violations. If senior supervisory staff disagree with the agent's conclusions, the case is reviewed in more detail with the agent or Director or both to determine what is presented to the Commission (doc. 126-1, ¶ 12).

9.      Notice of a complaint and a summary of the charges must be given to a complainant not less than 45 days prior to a scheduled hearing (commonly referred to as the "45 Day Letter"). (doc. 126-1, ¶ 13).

10.      The Alabama Ethics Act requires generally that the AEC "provide discovery to the respondent pursuant to the Alabama Rules of Criminal Procedure as promulgated by the Alabama Supreme Court." Ala. Code § 36-25-4(f).

11.      The Alabama Ethics Act also requires that "[i]n all matters that come before the commission concerning a complaint on an individual, the laws of due process shall apply." Ala. Code § 36-25-4(d).

12.      The AEC promulgated Ala. Admin. Code r. 340-X-1-.01, effective March 18, 1998,

and applicable during the relevant period, pursuant to its statutory rulemaking authority (Ala. Code § 36-25-4(a)(11). This rule interprets the Ethics Act to provide that the "respondent [in an Ethics Commission investigation] shall not be entitled to the commission's investigatory report, memoranda, witness lists, or other internal documents…or the substance of any statements made by prospective witnesses" (doc. 126-1, ¶ 15; doc. 126-2, Raulston declaration, ¶ 3; doc 126-3, Ala. Admin. Code R. 340-X-1-.01)

13.     Raulston and Albritton provided "witness statements to [respondents][29] if they contained information that may not be known to the respondent that was directly exculpatory, meaning that they would tend to negate a key element of the offense." (Id., ¶ 16; doc. 126-2, Raulston declaration, ¶ 4).

14.     Impeachment evidence was not provided prior to the adoption of § 36-25-4.4, effective September 1, 2023,[30] consistent with the AEC's role as a probable cause body without any right of cross-examination or formal evidentiary standards. The final decision as to what evidence should be produced in response to a request for discovery is generally made by Albritton and/or Raulston and/or Brian Paterson (Id., ¶ 16; doc. 126-2, Raulston declaration, ¶ 4).

15.     A copy of the report, the relevant evidence on which the report relies, and exculpatory evidence, is sent to each Commissioner prior to the hearing. Only evidence deemed truly irrelevant is not sent. The Commissioners can also access the entire file at any time prior to the hearing (doc. 126-1, Albritton declaration, ¶ 17; doc. 126-2, Raulston declaration, ¶ 8).

---

[29] The declaration states "complainants", but in context appears to mean "respondents.

[30] Ala. Code Section 36-25-4.4 is captioned "State Ethics Commission – Required disclosure of information" and clarifies what shall be provided to a respondent. The Act also explains that by disclosing exculpatory evidence, the commission or its employees are not liable for violating the restrictions relating to secrecy and nondisclosure of information.

16.     The order of presentation of the evidence before the AEC is set forth in Ala. Admin. Code r. 340-X-1-.01 (doc. 126-3).

17.     Following the presentation of the evidence and argument, the AEC votes to determine whether probable cause exists to find a potential violation of the Ethics Act. If the AEC finds probable cause, the matter is referred to the appropriate district attorney or the Attorney General's office (doc. 126-1, Albritton declaration, ¶ 20).

18.     A respondent may petition the AEC or otherwise agree to an administrative resolution of a complaint for minor violations upon a unanimous vote and subsequent approval by the appropriate district attorney or the Attorney General (Id., ¶ 21).

II.     Standard of review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut.

Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

III.    Analysis

A. Count One – Violation of the right to Equal Protection

In Count I, of the Second Amended Complaint (doc. 66), Plaintiffs alleges that Butler, Raulston, and Albritton violated their constitutional right to be "free from race discrimination as guaranteed by the Equal Protection Clause" in the Fourteenth Amendment (doc. 66, p. 26). Plaintiffs allege that Defendants were "motivated by invidious racial animus." (Id.).  More specifically, Plaintiffs allege that Defendant Butler, who is black, "harbored race-based invidious discriminatory animus against both Finley and Reaves because they had investigated Black police officers and Finley had promoted Reaves, a White police officer, instead of a Black officer to the position of Deputy Chief" (Id., p. 22).

Plaintiffs also allege that Butler "recruited" Raulston, a white female, to assist him in investigating the Plaintiffs, and to "assist in fabricating evidence and eliciting false testimony" against Finley "because Butler believed that Finley, a Black man, was 'disloyal' to the Black police officers he sought to discipline and [Butler] wanted Finley gone." (Id., p. 23). Plaintiffs also allege that "Butler and Raulston fabricated evidence and false testimony against Plaintiff Reaves, a White woman, based on Butler's belief that because of her race, Finley should not have promoted her (Id.). Plaintiffs allege that "Butler wanted Reaves removed from her position and gone from the police department." (Id.).

As to Albritton, Plaintiffs allege that "Butler and Raulston were fully aware that there was no basis to investigate Finley and Reaves" and that "aided by Albritton", they knew the AEC could be convinced to find Reaves and Finley guilty of ethical violations (Id., p. 24).

Defendants argue that they are entitled to qualified immunity as to Plaintiffs' claim (doc. 104, p. 20, n.4). Since Defendants have raised a qualified immunity defense, Plaintiffs "must clear the significant hurdle posed by" this defense. Jacoby v. Baldwin County, 835 F.3d 1338, 1343 (11th Cir. 2016). "A district court must adjudicate a defense of qualified immunity at whatever stage it is raised." Miller v. Palm Beach Cnty. Sheriff's Off., 129 F.4th 1329, 1333–34 (11th Cir. 2025); Persaud Props. FL Invs., LLC v. Town of Fort Myers Beach, Fla., 658 F. Supp. 3d 1072, 1085 (M.D. Fla. 2023), appeal dismissed, 2023 WL 6141293 (11th Cir. Aug. 14, 2023) (recognizing that "[w]here a qualified immunity defense is asserted, courts must first address such a defense before proceeding to defendant's alleged liability for the underlying constitutional claims.") (citing Jacoby, 835 F. 3d at 1343-1344).

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the

challenged action." <u>Jarrard v. Sheriff of Polk County</u>, 115 F.4th 1306, 1323 (11th Cir. 2024)

(quoting <u>Echols v. Lawton</u>, 913 F.3d 1313, 1319 (11th Cir. 2019)).  To obtain protection from

liability, Defendants "'must first establish that [they were] acting within the scope of [their]

discretionary authority when the alleged wrongful act occurred.'" <u>Id</u>. (quoting <u>Echols</u>, 913 F.3d

at 1319).

Defendants argue they were acting "pursuant to the performance of [their] duties" and

"within the scope of their authority." (doc 104, p. 25).  Plaintiffs argue that "Defendants fail at

this initial stage" because their argument is a "simple statement" that "Defendants 'were

exercising discretion in their work" (doc. 135-1, p. 39).  Plaintiffs assert that "Defendants do not

cite to any authority to support" that "pursuing a vendetta or personal grudge is the discretionary

work" of the Defendants.

To decide this issue, the district court must look to whether Defendants were "'(a)

performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through

means that were within his power to utilize.'" <u>Spencer v. Benison</u>, 5 F.4th 1222, 1231 (11th Cir.

2021) (quoting <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004)).

The district courts should look "to the general nature of [Defendants'] action, temporarily putting

aside the fact that it may have been committed for an unconstitutional purpose, in an

unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate

circumstances.'" <u>Spencer</u>, 5 F. 4th at 1231 (bracketed text inserted).  Thus, putting aside that

Defendants could have had a race-based animus, the evidence shows that Defendants' actions

were taken during an ethics investigation. <u>See</u> Ala. Code § 36-25-4 ("Duties; complaint;

investigation; hearing; fees; finding of violation."). Accordingly, the Court finds that Defendants

were acting within the scope of their discretionary authority, and within the performance of their

duties. See Estate of Cummings v. Davenport, 906 F.3d 934, 940 (11th Cir. 2018) (finding the scope of a state officials' discretionary authority is an issue of law).

At this point, the burden shifts to Plaintiffs to "prove that qualified immunity is not appropriate." Luke v. Gulley, 50 F.4th 90, 95 (11th Cir. 2022). "'The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" Scott v. City of Miami, 2025 WL 1647025, at *4 (11th Cir. June 11, 2025) (citation omitted). "To determine whether an officer is not entitled to qualified immunity at summary judgment," the district court must apply "a two-part inquiry." Dukes v. Deaton, 852 F.3d 1035, 1042 (11th Cir. 2017). The district court must consider "whether the facts, [t]aken in the light most favorable to the party asserting the injury, ... show [that] the officer's conduct violated a [federal] right." Dukes, 852 F. 3d at 1042 (citations omitted) (bracketed text in original). The district court must consider "whether the right in question was 'clearly established' at the time of the violation." Id. (citations omitted). To do so, the district court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment" but instead at summary judgment, "determine whether there is a genuine issue for trial[.]" Id. (citations omitted).

The district court "can consider the merits and clearly-established prongs in either order, and 'an official is entitled to qualified immunity if the plaintiff fails to establish either.'" Jarrard, 115 F. 4th at 1323 (quoting Piazza v. Jefferson Cnty., 923 F.3d 947, 951 (11th Cir. 2019)). But for Plaintiffs "to overcome a claim of qualified immunity, both questions must be answered affirmatively. If the answer to one is 'no,' the court need not reach the other." Myrick v. Fulton County, Ga., 69 F.4th 1277, 1297 (11th Cir. 2023).

The Court begins with whether Plaintiffs have made a sufficient showing that Defendants' conduct violated their constitutional right to Equal Protection.  If there was no violation, the Court need not determine whether the right was clearly established, and Defendants will prevail on their claim of qualified immunity.

The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "The Equal Protection Clause requires government entities to treat similarly situated people alike." Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313 (11th Cir. 2006).  "'To establish an equal protection claim, a [plaintiff] must demonstrate that (1) he is similarly situated with other [persons] who received more favorable treatment[.]'" Mohit v. West, 2023 WL 239992, at *4 (11th Cir. Jan. 18, 2023) (quoting Jones v. Ray, 279 F.3d 944, 946–47 (11th Cir. 2001) (quotation omitted)).  To be similarly situated, plaintiff must show the comparators are "prima facie *identical in all relevant respects*."  Grider v. City of Auburn, Ala., 618 F.3d 1240, 1246 (11th Cir. 2010) (italics in original).

A plaintiff must also show that "'(2) the defendant 'engaged in invidious discrimination against him based on race, ... or some other constitutionally protected interest[.]' ' " Mohit, 2023 WL 239992, at *4 (quoting Damiano v. Fla. Parole & Prob. Comm'n, 785 F.2d 929, 932–33 (11th Cir. 1986)).  "To prevail on a § 1983 equal protection race discrimination claim, a plaintiff has to establish discriminatory motive or purpose, not merely disparate impact." Lambert v. Bd. of Trustees of Univ. of Alabama, 2019 WL 339178, at *10 (N.D. Ala. Jan. 28, 2019), *aff'd sub nom*. Lambert v. Bd. of Trustees, 793 Fed. Appx. 938 (11th Cir. 2019) (citation and quotation marks omitted). Elston v. Talladega Cnty. Bd. of Educ., 997 F.2d 1394, 1406 (11th Cir. 1993) ("To establish an equal protection clause violation, a plaintiff must demonstrate that a challenged

action was motivated by an intent to discriminate.").

Defendants argue that Plaintiffs cannot establish either element of an Equal Protection claim. First, they argue that Plaintiffs did not identify any comparators, i.e., a similarly situated person who received more favorable treatment. Second, Defendants argue that Plaintiffs cannot establish that their actions were based on race, a constitutionally protected interest (doc. 104, p. 20, n. 4; p. 20-24).

In response to Defendants' first argument, Plaintiffs argue that the ethics complaint against "the four Black comparators, [police officers] Webster, Harrison, Ware, and Mackey [was] not treated in the same discriminatory manner as the Plaintiffs" (doc. 135-1, p. 36). Specifically, that their ethics complaint was sent to Defendants with documentation that the police officers had personally benefitted over $493,000 for their use of "City time, vehicles, and property" while the complaint against Plaintiffs involved the minimal costs of ammunition and use of the shooting range, that the investigation of the police officers was minimal with only one document request made to the City while the investigation of the Plaintiffs resulted in production of "thousands of pages of documents", that the ethics complaint against the police officers was dismissed without explanation or reason while the investigation of the Plaintiffs was extensive and based on false and fraudulent information generated by the Defendants, and that the comparators were given a public forum at the April 6, 2021, City Council Working Session, but Plaintiffs were not (Id., p. 36-38).

However, the four black officers were not similarly situated to Plaintiffs. Apart from working for the same police department, there are no similarities. The four black officers were investigated for alleged ethics violations concerning off-duty employment. Plaintiffs were investigated for alleged ethics violations for use of City resources for personal gain. Thus,

Plaintiffs have failed to identify any comparators who were similarly situated and received more favorable treatment.

In response to Defendants' second argument, that Plaintiffs cannot establish that Defendants' actions were based on race, Plaintiffs argue that the "evidence shows race was a factor." (doc. 135-1, p. 37). In support, they argue that Finley's promotion of Reaves was disfavored by Mayor Reed. Specifically, Finley was "stereotyped by the mayor, as a black man [who] was supposed to favor black officers not treat them equal", i.e., on equal grounds with Reaves who is white (Id.). They also argue that the "comparator officers are Black and have alleged race discrimination against Reaves because she allegedly disciplined them more harshly than white officers" (Id., p. 37-38). Next, they argue that Mayor Reed "intent on casting Reaves and Finley in a false light and subjecting Reaves to gender and race discrimination, condoned the Black female police officers conspiring on Reaves and Finley by filing complaints on a monthly basis and even more frequently…" (Id.).

The Court understands their argument to be that Butler (black male) and Raulston (white female) were essentially doing the bidding of Mayor Reed (black male) to retaliate against Finley for selecting a white person for the Chief Deputy position and for Finley's recommended punishment of black officers. This argument is not supported by any evidence. First, there is absolutely no evidence that Raulston and Butler (or Albritton) investigated Finley or Reaves because of their race. And even if the Court credited the unsubstantiated allegation that Mayor Reed had a retaliatory motive that was based on race, there is insufficient evidence that this motive was adopted by Albritton, Raulston or Butler.

When questioned how Raulston and Albritton discriminated against him on basis of race, Finley didn't have an answer to the question (doc. 128-2, p. 6). When questioned why he

believed that Butler discriminated against him on basis of race, Finley stated that Butler "was driven to bring charges" when there was "clearly no violation",[31] that he "aggressively embarrassed" Finley, that he "took it personal" because a 2018 investigation against Finley had been dismissed, that he told Finley's attorney he wanted Finley's resignation, and that he was among a group of black pastors who were displeased with him for his discipline of the black police officers (doc. 128-2, p. 7-9, Finley Deposition).  When asked how "any of that" was based on Finley's race?", Finley answered that Butler chose to investigate him and Reaves but did not investigate the black officers who were alleged to have violated the off-work policy (Id., p. 9).

When questioned whether Albritton "personally acted" because of her race or gender,[32] Reaves testified "I don't believe so" (doc. 128-3, p. 10).  When questioned whether Ralston "personally acted" because of Reaves' race or gender, Reaves referenced a comment made by a Commissioner during the ethics hearing (Id., p. 11-12). The comment was not made by a Defendant.  When asked "what evidence do you have that Cynthia Raulston was motivated in any way by your race" or "Gender", Reaves answered "I don't" (Id., p. 12).  When questioned whether she had "information to suggest" that Butler was motivated by her race or gender, Reaves answered "no, sir" (Id., p. 14).

While Plaintiffs' brief is replete with accusations, it fails to produce evidence in support. The evidence is simply insufficient for a reasonable jury to find that an invidious racial animus was the motivation for Butler, Raulston, and Albritton's conduct during the investigation. Accordingly, summary judgment is granted in favor of the Defendants as to their claim of

---

[31] Finley alludes to the City's decision that changing the firearms qualification policy was within his authority.

[32] Reaves was asked whether Albritton acted on basis of her gender.  However, the Second Amended Complaint does not appear to allege gender-based discrimination (doc. 66).

qualified immunity.

B. Count II - Deprivation of Due Process under Fifth and Fourteenth Amendments

In Count II, Plaintiffs allege that Butler, Raulston, and Albritton's conduct during the investigation violated their constitutional right to due process as provided in the 5th and 14th Amendments. They allege that Defendants "used false evidence, false testimony, and material misrepresentations", and suppressed exculpatory evidence during the AEC investigation and at the August 4, 2021 AEC hearing, which denied their right to due process (doc. 66, p. 27-30)

Plaintiffs also allege that Raulston and Albritton violated their due process rights because they did not prohibit Butler from participating in the investigation. They allege two reasons that Butler should not have participated in the investigation. First, they allege that Butler had previously been involved in an unrelated civil action where there were "prior complaints of his misuse of his position"[33] (Id., p. 28). Second, they allege that Butler had conflicts of interest; Reaves had been his supervisor when Butler was an MPD officer and Butler was friends with "several police officers" who Plaintiffs investigated and ultimately reported their conduct to the AEC (Id., p. 28).

Defendants argue that they are entitled to qualified immunity as to Plaintiffs' claims (doc. 104, p. 24-43). As previously stated, the Court looks first to whether Defendants were acting pursuant to the performance of their duties and within the scope of their authority. Defendants argue they were (doc. 104, p. 25). Plaintiffs again argue that "Defendants do not cite to any authority to support" that "pursuing a personal vendetta or personal grudge is the discretionary

---

[33] Plaintiffs point to Butler v. Dunn, 2019 WL 7041866 (N.D. Ala. 2019). The district court dismissed Butler's action against Damon Dunn, the owner of a Dunkin Donuts. Butler claimed that he and his wife had been subject to race discrimination because they were charged for extra flavorings in their coffee, but white customers were not. Dunn, who is Black, denied the allegations. Butler is alleged to have intimidated an employee and misused his position by telling the employee that he was an investigator for the AEC.

work" of the Defendants (doc. 135-1, p. 39).

As previously explained, to decide this issue the district court must look to the "general nature of [Defendants'] action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.'" Spencer, 5 F. 4th at 1231. Thus, putting aside that Defendants could have had a personal grudge or vendetta, the evidence shows that Defendants' actions were taken during an ethics investigation. Accordingly, the Court finds that Defendants were acting within the scope of their discretionary authority, and within the performance of their duties.

The burden now shifts to Plaintiffs to make a sufficient showing that Defendants' conduct violated their constitutional right to due process which deprived them of a liberty or property interest. If there was no violation, the Court need not determine whether the right was clearly established, and Defendants will prevail on their claim of qualified immunity.

The Due Process Clause of the Fourteenth Amendment prevents state and local governments from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1; Henry v. Sheriff of Tuscaloosa Cnty., Alabama, 135 F.4th 1271, 1296 (11th Cir. 2025).  "A claim alleging a denial of procedural due process under the Fourteenth Amendment 'requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process.'" Osborne v. PNC Bank, No. 24-11200, 2024 WL 4448791, at *3 (11th Cir. Oct. 9, 2024) (quoting Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003)).

Plaintiffs argue that their right to due process before the AEC was violated because Defendants did not provide exculpatory evidence that was in their possession and that the right

was clearly established (doc. 135-1, p. 38-42).[34] Specifically, Plaintiffs state that Raulston

provided "limited Brady discovery to Peck Fox, Finley's lawyer, three days prior to the hearing,

but suppressed the discovery to Reaves."[35] (Id., p. 41). In their response to Defendants'

argument, Plaintiffs did not specifically identify what discovery they believed had been withheld.

In a separate section (doc. 135-1, p. 32-33), Plaintiffs point to allegedly exculpatory

documents that were not disclosed. Specifically, emails between Bellinger and Butler on April

16, 2021 and April 19, 2021 which discuss the purported rescission of Policy 2.311 by Policy

3.2.4, Hoffman's Memorandum ("Defendants represented the Memorandum had Policy 2.311

attached, which it did not."), Policy 3.2.4, the redacted Form 28, three memos by the Firearms

Instructors regarding Detective Thomas' third attempt to qualify[36] (doc. 132-10, p. 31-33, Under

Seal), Barousse witness statement, Miliner witness statement, and Dean witness statement.

Plaintiffs claim they were denied procedural due process. As previously stated, a "claim

alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of

a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-

inadequate process." Arrington v. Helms, 438 F.3d 1336, 1347–48 (11th Cir. 2006). As to the

violation of the Grand Jury Secrecy Act and the 180-day investigative period,[37] Plaintiffs have

---

[34] Specifically, Plaintiffs argue that "[w]hen the legislature incorporated Rule 16.l(f) into the Commission's enabling statute and further required the application of the "laws of due process" to individual respondents, the disclosure of exculpatory evidence to a respondent became a legal obligation of the Commission and its staff." (doc. 135-1, p. 42).

[35] Plaintiffs allege that Killough's witness statement was given to Finley but not Reaves.

[36] These memos were offered as support for the position that no officer received a third attempt after Reaves until Detective Thomas, the next day. They were attached to Butler's report to the AEC.

[37] Plaintiffs argued that jurisdiction to investigate Finley and Reaves expired on May 3, 2021, and that there was no evidence the AEC approved an extension (doc. 135-1, p. 42, n. 24). However, on April 7, 2021, the AEC approved a 180-day extension (doc. 126-11).

failed to identify a constitutionally protected liberty or property interest, much less a constitutionally inadequate process.

As to whether failure to provide exculpatory evidence states a substantive due process claim, the law is unclear. The Supreme Court has held that the failure to disclose material exculpatory evidence violates due process rights but has never held whether it is substantive or procedural due process that is at issue. See <u>Brady v. Maryland</u>, 373 U.S. 83(1963). The Eleventh Circuit has also declined to decide the issue. See <u>Porter v. White</u>, 483 F.3d 1294, 1305 (11th Cir. 2007) ("It is unnecessary in this case to determine whether Porter's claim sounds in procedural or substantive due process.") And this Court also need not decide. This is because Plaintiffs' claim of substantive or procedural due process is not substantiated under the law or the facts.

Plaintiffs have cited no support for the contention that Plaintiffs had a <u>federal</u> constitutional right to exculpatory evidence in the context of an administrative proceeding. While the AEC is a body that considers criminal violations of ethics laws, it has no power to criminally charge, convict or criminally punish the alleged offender. Rather the AEC resolves whether there are grounds for the Attorney General or District Attorney to pursue criminal charges. There is no constitutional right to <u>Brady</u> material in an administrative proceeding.

Moreover, the unrebutted evidence is that Raulston provided the defense attorneys with copies of both Policy 2.311 and Policy 3.2.4, the policy that allegedly rescinded Policy 2.311 and that both defense attorneys, Fox and Wells, and Finley were aware that at least an attempt to rescind Policy 2.311 had occurred (docs. 127-6, emails between Fox and Bellinger; doc. 127-8, Fox deposition; doc. 127-9, Wells deposition; doc. 128-1, Respondents acknowledgement of receipt of discovery). Since Plaintiffs have failed to show the violation of a constitutional right, Defendants are entitled to summary judgment as to their qualified immunity defense.

C. Count III – Violation of Civil Rights under the Fourteenth and Fifth Amendment

In Count III, Plaintiffs allege that Defendants Butler and Raulston's conduct violated their "right not to be deprived of property without due process of law" under the 5th Amendment, as extended to the states by the 14th Amendment (doc. 66, p. 30-32). Plaintiffs allege they "had property rights in their positions … and the accompanying benefits" and that Butler and Raulston's conduct deprived them of that right without due process (Id., p. 30).

Defendants argue that "this claim fails for the reasons discussed in Sections I and II above" (doc. 104, p. 43).  Thus, Defendants appear to argue that they are entitled to qualified immunity as to Count III.

Plaintiffs argue that the claims in Count III for violation of civil rights under the 5th and 14th Amendments (Equal Protection and Due Process) are "direct claims under the Constitution, known as Bivens[38] claims" and "exist to provide relief for violations of the Constitution where no other effective means exists for the protection of those rights" (doc. 135-1, p. 43).  Plaintiffs argue that they "have included their separate Bivens claims as a back-up in the event the Court concludes that Section 1983 does not reach the Constitutional claims which Plaintiffs seek to secure through statutory provision." (Id.)

Plaintiffs did not plead Count III as brought pursuant to 42 U.S.C. § 1983. Thus, they appear to raise Bivens claims against the Defendants.  However, as explained in Fleming v. United States, 127 F. 4th 837, 842 (11th Cir. 2025), "Bivens and its progeny.... recognizes 'an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'"  There are no federal officers sued in this action. See Rodriguez v. Noem, 2025 WL 1517221, at *3 (S.D. Fla. May 28, 2025) (quoting Corr. Servs. Corp. v. Malesko, 534

---

[38] Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

U.S. 61, 66 (2001) ("In <u>Bivens</u>, the United States Supreme Court 'recognized for the first time an implied private action for damages against federal officers' for violations of certain constitutional rights."). Accordingly, summary judgment is granted in favor of Defendants as to Count III.

D.  Count IV – Conspiracy to violate Plaintiffs' Civil Rights

In Count IV, brought pursuant to 42 U.S.C. § 1985, Plaintiffs allege that Defendants "conspired with Mayor Reed and agents of the City of Montgomery to deprive Plaintiffs of their constitutionally-protected rights to due process and equal treatment under the Fourteenth Amendment." (doc. 66, p. 32-33). Plaintiffs also allege that "Defendants' conduct was driven by a race-based invidious discriminatory animus against Plaintiffs (Id., p. 33). "Defendants believed that Reaves should not have been selected as Deputy because of her race, White" and that "Defendants also believed that Finley, as a Black male, should not have investigated, nor permitted Reaves to investigate, the Black police officers for fraud and theft." (Id.).

Defendants argue that the claim fails for the same reason as Plaintiffs' claim under the Equal Protection Clause of the 14th Amendment.  Specifically, there is no evidence of any race-based animus. They also argue that there is no evidence of any agreement between Defendants and any City employee or Mayor Reed (doc. 104, p. 43).

Plaintiffs argue that to establish a violation of 42 U.S.C. § 1985(3), they must show evidence of an agreement to violate a constitutional or federally-protected right, which is motivated by an invidious discriminatory animus (doc. 135-1, p. 40-141). In an effort to show a nefarious agreement, Plaintiffs point out that Butler and Raulston discussed the investigation with Webster; scheduled a meeting with Mayor Reed, Bellinger, Hill "and others at the City" to discuss the ethics investigation; and discussed "[grand jury secrecy] information with Bellinger,

then the mayor and city council." (doc. 135-1, p. 45).  In an apparent effort to include Albritton, Plaintiffs add that "Albritton made no comment about Raulston violating Grand Jury Secrecy and the policies of the AEC" (Id.).

> To be liable under this civil conspiracy statute, a defendant must have:
>
> (1) conspired . . . (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) taken or caused an action to be taken in furtherance of the conspiracy's object, and (4) injured an individual's person or property or deprived her of exercising any right or privilege of a United States citizen.

Dean v. Warren, 12 F.4th 1248, 1255 (11th Cir. 2021) (citing Griffin v. Breckenridge, 403 U.S. 88 (1971)). "A claim under § 1985(3) also requires 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" Coker v. Warren, No. 23-11160, 2025 WL 1575578, at *6 (11th Cir. June 4, 2025) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).).  "'That animus standard requires that the defendant proceeded on his course of conduct "because of, not merely in spite of, its adverse effects upon an identifiable group.'" Coker, 2025 WL 1575578 (quoting Dean, 12 F.4th at 1255). "In the context of section 1985 conspiracy claims, 'conclusory, vague, and general allegations of conspiracy may justify dismissal of a complaint.'" Coker, 2025 WL 1575578 (citations omitted),

Plaintiffs argue that certain interactions among Defendants and City employees and Mayor Reed is evidence from which a jury could reasonably infer that a conspiracy existed. However, Plaintiffs have not presented sufficient evidence of an agreement, informal or otherwise, between City officials and AEC employees to deprive Plaintiffs of equal protection. Plaintiffs rely upon conclusory allegations and speculation.

Additionally, Plaintffs failed to provide any evidence that the alleged conspiracy was motivated by racial animus. Plaintiffs speculate that Mayor Reed didn't like Finley's choice of

Reaves for chief deputy because she is white and they speculate that Mayor Reed didn't want black officers disciplined harshly.  However, Plaintiffs fail to back these accusations with any evidence.  Then, Plaintiffs take another leap and accuse the AEC employees of adopting this speculative racially discriminatory motive.  At best, Plaintiffs' evidence would support an argument that Butler did not like Finley and thought he was a bad guy.  But there is nothing to support that this opinion was based on Finley's race.  Accordingly, summary judgment is granted in favor of the Defendants.

     E.  <u>State law claims (Counts V-XI)</u>

     Subsection (a) of 28 U.S.C. § 1367 states that "[i]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Here, the Court's original jurisdiction is based on federal question under 28 U.S.C. § 1331 and 1343.

     As discussed herein, the federal claims are dismissed with prejudice.  In that procedural posture, 28 U.S.C. § 1367(c)(3), provides that the "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction[.]" <u>See Hicks v. Moore</u>, 422 F.3d 1246, 1255 n.8 (11th Cir. 2005).  When exercising discretion to decline supplemental jurisdiction, the district court should consider principles of judicial economy, comity, convenience, and fairness to the parties. <u>Palmer v. Hosp. Auth. of Randolph County</u>, 22 F.3d 1559, 1569 (11th Cir. 1994) (finding that the factors set forth in <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966) should be used).  The Court of Appeals for the Eleventh Circuit has "encouraged district

courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." Raney v. Allstate Insurance Co., 370 F.3d 1086, 1089 (11th Cir. 2004). This holds true at the summary judgment stage.  Charles v. Johnson, 18 F.4th 686, 691 (11th Cir. 2021) (affirming the district courts grant of summary judgment and decision to decline to exercise supplemental jurisdiction over the state claims).

Upon consideration of the principles of comity, convenience, judicial economy, and fairness to the parties, the Court declines to exercise supplemental jurisdiction over the remaining state law Counts V through XI and they are dismissed without prejudice.

Plaintiffs are reminded that

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d).

IV.    Conclusion

For the reasons set forth herein, Defendants' motion for summary judgment as to Counts I through IV is GRANTED and these Counts are dismissed with prejudice.

The Court declines to exercise supplemental jurisdiction over Counts V through XI and these Counts are dismissed without prejudice.

Final judgment shall enter by separate document as required by Fed. R. Civ. P. 58(a).

**DONE** and **ORDERED** this the 25th day of June 2025.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**